Hi, we have our next case is Sysco Machinery Corporation v. DCS Mrs. Pellegrino, we're happy to have you here Good morning, your honors, and may it please the court. Arianna Pellegrino on behalf of the appellant, Sysco Machinery Corporation. This appeal arises out of two orders from the district court. First, in order dismissing Sysco's first and only complaint under Rule 12b-6, and second, in order denying leave to amend even once. The district court erred in both of those orders, but before I explain why, I would like to briefly explain some of the procedural background and the context for how we got here, because I think it's critical to understanding why the district court ran afoul of the facts in the law in this case. Sysco is a Taiwanese corporation that develops what are called rotary die cutting machines, which most of us probably haven't seen in real life, but they are quite intricate, large machines, oftentimes the size of an entire wall. And they're used to make these products that have multi-layers, things like surgical repair patches, even something as simple as a screen protector. Over the course of more than 40 years, Sysco dedicated millions of dollars and 30% of its workforce to improving the precision and efficiency of these machines. These machines are custom, and they rely on a host of confidential and proprietary information to design and manufacture them. For many years, Sysco sold those machines into the United States, often for contracts worth millions of dollars through the, aptly in this case, DCS. And until April of 21, Sysco was the only supplier in Taiwan who was capable and who had the experience to design and manufacture these machines based on a long history of developing their confidential and proprietary processes. At about that time, in 21, a number of high-level Sysco employees, unknown to Sysco while they were working for Sysco, developed a competing business called Syntech. After their departure, Sysco conducted a number of computer and e-mail analyses and found that those employees... The problem that Judge Boyle found here was a lack of precision. And he was asking, well, what is the proprietary, exactly what is the proprietary software? Because that gives the opposing party notice. And it looked kind of like to me that Sysco was claiming that the whole company was a trade secret. But is there some more precise formulation that you could make during your plea? Of course, Your Honor. So I agree that Sysco sort of started with this high-level introductory, here's a general description of our trade secrets. I think what the district court missed is that Sysco then drilled down and explained what are effectively five categories, not the whole company, of trade secrets that help it sort of hold this place in the business and design and manufacture these RDCs. Those include things like layout diagrams. All right. Can you give me where in the complaint I'm supposed to be looking for this? Sure. So if we look at Joint Appendix 35, for example, it describes machine parts design layouts, structural drawings, the explored diagrams, the machine parts test data, on-site acceptance tests, and also at Joint Appendix 15, it describes the proprietary software program called Sysco Vision Studio. And so with respect to the district court, I disagree that we were sort of claiming the entire business as a— I'm sorry. So the argument here, I just want to make sure I'm understanding what the argument is. Sure. Because I was sort of like Judge Boyle. I'm not sure I understand what we're doing here. So you think it's Paragraph 54? And why do I think Paragraph 54 is describing trade secrets? Does it tell us that Paragraph 54 is trade secrets? What it tells us is that the trade secrets are embodied in what we described in the complaint as what are called files at issue. Okay. Tell me where I see that. So I see that the files at issue, this is the Paragraph 49. What you're saying is that the proprietary information and trade secrets contained in certain files. And the argument is that then that's defined as files at issue. And then the description here of technical documents, test videos, statistical data, client contracts, and other confidential information. That, which I think is like basically everything, that's what the trade secrets are? I mean, that's like the documents. But why don't we think—why wouldn't we understand what the trade secrets are there? Well, if you read sort of the background section that talks about these files at issue, as we continue here into 55, 56, what we explain is that those files, so for example, the layout diagrams, the component design diagrams, those supplier relationships, they've allowed Cisco to develop these systems and processes. For example, testing processes, material pulling diagrams, in other words, the way the machine pulls material and functions and operates in that sense. And it allows Cisco to create a machine that is more efficient, creates higher yield products, and sort of solves an older mode of—a problem present in the older mode of technology. But is the breadth of the complaint here, this is a trade secret, this is a trade secret, this is a trade secret, are we getting to the point here that I think Judge Boyle questioned? Can we really say that the whole business is a trade secret? Because—and does that give the opposing party the kind of notice that it would normally expect in a trade secrets case? Most of these cases are litigated, and I've sat in a number of them, and they identify the trade secret with a degree of precision that the parties can lock horns on. But this seems to me to be a little bit close to a moving target. Well, this is a trade secret, and if that doesn't work, this is a trade secret, and it sort of sprawls all over the place. If—one thing I want to know is—maybe you can explain this to me. If all these things are trade secrets, when you file the technical documents with the Copyright Office, they were not labeled confidential, and it would almost be like you wanted the public to know about this, I guess, so that you would scare competitors off. But if these things are trade secrets, don't—isn't there normally a confidentiality label attached to the filings with the Copyright Office and technical documents? I would agree that would be the case if that's what we were claiming was part of the trade secrets. As we stated to the court below, both in the complaint and in the briefing on the motion to dismiss, we do not claim that the technical documents deposited with the Copyright Office comprise the trade secrets. Was there any impediment to labeling those documents confidential when you file the technical documents? It seems to me you'd want to—if they were really true trade secrets, their documents file with the Copyright Office all the time, and companies label what they don't want revealed to competitors. They label them confidential, and this wasn't done here. I confess I am not a copyright lawyer, so I don't know if there are impediments or not, but I think from our perspective, whether there is an impediment doesn't really speak to our issue because we don't claim that those technical documents deposited with the Copyright Office aren't the trade secrets. Okay, so how do I—I take your word for it, right? But when I read 54, right, which is where you pointed me to, right, it says—it's like it includes the files at issue, which is then, I think, at least by implication being suggested that those are the trade secrets, right? That those are the technical documents, right? And they include specifically, right, machine parts design layouts, explore diagrams, you know, the things that sort of seem to be, you know, on pages, you know, whatever it is, 15 to 20, right? Those seem to be the same type of technical documents. And so if those are not trade secrets, which I take Judge Wilkinson's questions and your agreement to be they can't possibly be, then how do—why are the files at issue now trade secrets? Because they plainly, by description, would include the things that have already been, like, reprinted in the complaint. I would answer the question twofold, Your Honor. First, I would say we made clear at the beginning of the complaint, including that on the first page of paragraphs 1 through 5, I believe, that the copyright claim and the trade secrets claim are distinct. Certainly this— Totally get that. But what I'm trying to understand is what are the trade secrets? And then when you describe to me what the trade secrets are, you give me a description that includes the pictures that appear. And so that means that that description can't be the trade secrets, right? That description at least doesn't exclude the things that plainly can't be trade secrets. Totally agree. So on that first point, Your Honor, at paragraph 3, we define, again, where I said that high-level trade secrets definition to exclude copyrights. Again, it is a distinct claim from the claim for copyright infringement. Sorry, I'm just—I don't read quickly enough. Can you tell me where it excludes on the copyright materials? Sure. Paragraph 3 specifically does not include the copyrighted materials. You said it excludes it, right? It doesn't exclude it. You're just saying it doesn't specify, right? Because it just says compilation of machinery or trade secrets. And then the copyright includes compilations of machinery. So it seems like to me it isn't exactly included. Well, I guess I would respectfully disagree, I think, by not including it. When I look at JA-27, I have no idea what that is, but I assume that that is some, like, schematic of a machine, right? It is deposited with the Copyright Office. That's right. Right. And so if that's a schematic of a machine, why is that not actually expressly included in paragraph 3? I suppose we take a different read, and I think that goes to my— I want you to help me understand why your read is like a plausible one is what I'm asking for. Well, I suppose what I would say is hindsight is 20-20, Your Honor. I think in our view we were defining trade secrets in a way that did not include the material deposited with the Copyright Office. But these are moving targets. I mean, this is the problem is, as my colleague's good questions reveal, we're having trouble identifying what it is. It just is, it is this, it is that, that may be included, that may be excluded. I have a question also about when the district court denied the failure to amend. I think one of the reasons was given was that the plaintiffs had litigated this case in various different forums, Massachusetts and North Carolina, and that part of the tactic here was to get a TRO in some court and a preliminary injunction, and then those requests were denied, no TRO and no preliminary injunction. And then at that point there was a filing for a dismissal without prejudice in Massachusetts, all right? Then we moved the caravan down to North Carolina, and the charge is made that you never did let the district court know, let one court know what was happening with another. In other words, you're going in these various forums. When things don't appear to work out for you in one forum, you file for a dismissal without prejudice, and then when you're in another forum, you don't let them know what went on, what was going on in the previous forum, and this would understandably drive an opposing counsel to distraction, and they claim that as a result of this, you know, forum, it's not forum shopping, I guess, it's forum hopping, that they incurred at least another $45,000 in attorney's fees trying to keep up with all this, and what are we supposed to do with that litigation history? Well, I disagree with the characterization as forum hopping. It seemed to me the district court was concerned about that fact. The district court was certainly concerned about it, but respectfully, I think the district court mischaracterized what happened. In the initial, the procedural history is a little bit different. In the initial North Carolina litigation, it was a case that never even got past the TRO stage. No party filed an answer. No party other than DCS was even served. Well, why can't you file in Massachusetts, and that's where you filed, and plaintiff has a choice of forum, and then see the matter through in Massachusetts, rather than encounter an adverse event in the Massachusetts litigation, and then move for a dismissal without prejudice and say, oh, we have a different forum here. We may get a more sympathetic judge. I mean, this is not a good way to litigate, and if you're in the shoes of opposing counsel, they are not wrong in expressing a degree of annoyance at what they've been put through. Well, I do want to clarify something. The Massachusetts lawsuit, DCS was not a party. What we explained in our brief, what we explained to the court below, is that before this case had even moved to the time to respond or service or anything like that in North Carolina, we thought it was the better course of action to pursue who we believed were the primary actors, SimTech and Symmetric, not DCS, in Massachusetts, where the source of this major customer contract was. SimTech, the competing company formed by these departing employees in Massachusetts, said, no, it's not us. We don't control the solicitation of these customers. It's DCS. That is why we pursued DCS again. And in terms of the attorney's fees expended, again, DCS is not a party to that lawsuit. They don't expend any attorney's fees. The entire course of what DCS has, I guess, defended against, is an initial motion prior to any answer or response and a response to the complaint. All right. Thank you. You've reserved some time for rebuttal, and we want to make sure that you have that. Thank you, Your Honor. Do you have some questions? Thank you. We don't have any questions. Thank you. Mr. Dalton. One of the elements of a trade secret claim is that it was misappropriated. And these folks at DCS came into possession of this information through the course of a manufacturer-distributor relationship. Help me out with the law here. Is that a wrongful misappropriation of a trade secret if someone comes in possession of information in the course of a normal distributor-manufacturer relationship? I suppose it would appear to be a question of what they did with what they came into possession of. Why don't you expand that a little bit? Yes, Your Honor. Well, it would depend on the circumstances in which they came into possession of the documents, and then it would depend on how they used it. So I'll apply that to the facts here twofold. Number one, DCS was a long-term distributor of Cisco's machinery and came into possession of material and was under no duty to keep it confidential. Therefore, it could not be any information that DCS received from Cisco would not fall within the definition of a trade secret. Was DCS notified in the course of that manufacturer-distributor relationship that it was dealing with confidential materials, or was that part of the relationship? As far as Cisco is concerned, there is no allegation that DCS owed a duty of confidentiality for any Cisco information. They actually expressly allege that Cisco did not supply trade secrets to DCS. So any information that DCS or the customers that DCS obtained and helped develop machines for would not be a trade secret because DCS lawfully came into possession of that material and there were no restrictions on what it could do to use it. Now I think what your question is getting at is what is required for misappropriation of a trade secret. Now we have expressed our belief that the complaint does not even allege that DCS came into possession of Cisco's trade secrets. They don't seem to disagree with that. They came into possession of whatever the trade secrets are. I don't know yet exactly what the trade secrets are, but whatever they came into possession of, they came into possession of by virtue of a manufacturer-distributor relationship, correct? Whatever information DCS received from Cisco was from that relationship and there was no duty of confidentiality of it, again, so that it could not meet the definition of trade secret under the Defense of Trade Secret Act. But you're saying that in the course of the manufacturer-distributor relationship, because I don't think the fact that it's a manufacturer-distributor relationship pursues any kind of per se bar to a misappropriation claim. The question is during the course of that relationship, was the distributor put on notice that it was dealing with confidential materials or trade secrets? Not of Cisco. There is no allegation that Cisco made DCS aware that Cisco was sharing alleged confidential information. So you're saying that they came into possession of the information through an ordinary business relationship of a manufacturer-distributor and that in the course of that ordinary business relationship, there's no allegation that they were put on notice that they were dealing with something that was a trade secret and wanted to be dealt with on a hush-hush basis. Correct. So I understand, maybe we'll ask your colleague, but I understood the argument to be slightly different, that the trade secrets, and I'm at paragraph 108 of the complaint, that the trade secrets that they're complaining about, whatever in the world they are, are the materials that DCS got from Simtek, right? So that this is, they're not, I think for the reasons Judge Wilkinson rightly points out, they cannot possibly be claiming that the information that they gave directly to DCS would qualify. And so I take them to be saying that they got them from Simtek. It's a little odd because then the paragraph goes on to say they got it from Simtek while the former Cisco employees were employees of Cisco. That didn't actually make sense to me. But what about that theory, right? That the trade secrets, if we could figure out what they were, that were improper came through Simtek and DCS had some reason to know that they had been misappropriated, that Simtek had been misappropriated from Cisco. In theory, wouldn't that potentially work? I mean, that would potentially get us over this hurdle, right? Potentially. The problem with that is that paragraph that you allude to is just simply a conclusion and it's impossible for us to identify from this complaint what the trade secrets are that allegedly were provided from Simtek to DCS. No, no, I'm 100% on board there. I'm just saying, but with respect to whether they got them, it's not just that they got them as a distributor. The allegation seems to be limited to not all the information that they got from Cisco, but in fact, what they got from Simtek while the Cisco employees were still employees of Cisco. So once they had left Cisco, I think whatever they provided DCS at that point doesn't matter either. They haven't alleged that's a problem. They're just saying, I don't actually understand how it works. We'll ask the client. But that would, in theory, had they identified the trade secrets, that might be a theory, if actually supported, that would permit such a conclusion. In theory, if there were additional factual allegations that would support that. That's part of the problem. That's probably what we argued in our brief, that they don't allege factual allegations that DCS actually possesses a trade secret of Cisco. And they argue that that's not required because they argue that use is not equal to possession. But there's a subsection to 1839 subsection 5 where it defines misappropriation. And in those subsections, it defines a term called, with knowledge of, in the various ways that a trade secret may be misappropriated. And it would be impossible to misappropriate a trade secret and have knowledge of it if you don't possess that trade secret. So that's kind of the whole problem with their lack of any allegation that we actually possess a trade secret. And I would like to come back and address a few things that you guys ask about in my friends on the other side's initial argument. And that is the description of the trade secret. As was acknowledged during that argument, material that was copyrighted could not be a trade secret whatsoever. And if you look at the paragraphs that were identified, paragraph 54 of the complaint, it expressly uses the word that some of this material is copyrighted. It's describing the files at issue and it goes on to say some of which are copyrighted by Cisco. So then again, so this definition of files at issue includes copyrighted material. What paragraph are you on again, sir? On paragraph 54. Some of which are copyrighted. Correct. And then if you go to paragraph 134. Again, if you look at the conclusion, it says all of which constitute trade secrets. And prior to that, it includes the copyrighted works. So they're trying to include in their definition of trade secrets items which cannot be a trade secret. And that necessarily defeats their argument. The Third Circuit in the Mountain Cove case specifically acknowledged that when a description is so broad that it includes things that cannot be a trade secret, then it's not sufficient to describe a trade secret for this court. I will note that the parties have not identified a case where this court set the pleading standard for a trade secret. But the district courts in this circuit have routinely applied the same standard that Judge Boyle applied below. And they routinely rejected these broad and sweeping definitions of a trade secret that were used in this complaint. It must be difficult to litigate from your perspective this kind of case where the case is jumping from forum to forum. And where you also see it's kind of a now you see it, now you don't about what the trade secret is supposed to be. It can be a very frustrating task for an attorney when the case is not only moving around in terms of what the trade secret is, but also in what forum it's going to be litigating. I mean, that is bound to run up the lawyers' fees. And it just strikes me as a very frustrating situation. That's correct, Your Honor. I think Judge Boyle found it impliedly, at the very least, that it was unnecessary. And to kind of clear up the procedural history of the case, the action was first filed in North Carolina. It was pending before Judge Dever. And Cisco brought that action against DCS and also its former employees, who actually are alleged of taking and misappropriating the trade secrets, and the two Taiwanese companies, Symtec and Symmetric. And so it had all the parties. Then Cisco moved for a temporary restraining order. Attached to that motion included a declaration from one of the attorneys indicating that it had ex parte communications with one of DCS employees, which it was trying to impute liability to DCS from. Therefore, we filed motions with the district court seeking to strike that, seeking a protective order, and seeking sanctions for that ex parte communication. The district court at that time then immediately denied the TRO, granted our motion for protective order, and took the motion for sanctions under advisement. It was not until that that Cisco decided to take a voluntary dismissal of the first North Carolina action. And then soon, just a couple of days later, filed the action up in Massachusetts. When they got up there, they were successful in obtaining an ex parte temporary restraining order. But later on, in the court's opinions that are included in the record, the court denied its motion for a preliminary injunction, and it noted that when it granted the TRO that Cisco did not inform it that Judge Dever had just a few days before denied the TRO in North Carolina. Now that case up there was dismissed, and Cisco then brought this third action here in North Carolina against DCS. And then after... So it went from North Carolina to Massachusetts and back to North Carolina? Correct. And there was a dismissal without prejudice motions made to get the case out of one forum? That was in the first forum. To get it out of North Carolina, there was a stipulation of dismissal without prejudice. Okay. So then they tried their luck in Massachusetts? Correct. And was that case resolved with a dismissal without prejudice? It was not. So first the TRO was granted, the ex parte TRO, and then subsequently the preliminary injunction motion was denied. And in subsequent court orders, the court noted in a footnote that when the TRO hearing was held, that Cisco did not inform the court that the prior motion for a TRO had been denied. And so then that action has actually been dismissed because of forum nonconvenience, which was affirmed by the First Circuit. Can I ask just a question? You talk about the standard. I take it you agree there's not a heightened pleading standard. And is the standard with respect to identifying the trade secret, we described it once as saying, you have to describe the subject matter of the alleged trade secrets in sufficient detail to establish each element of a trade secret. This is the Trendez versus Atkinson case. Is that the standard that you think is right, that we have to be able to identify not only what it is but why it's a trade secret, so that we then can determine whether it's been misappropriated or whether you have it or whatever the story is? That's correct. So that court actually also went on to say that the description must distinguish the trade secret from matters of general knowledge and of special knowledge of persons skilled in the trade. And so that was the exact standard that the Third Circuit applied in the Oakwood case recently when it set the standard for pleading a trade secret for a 12B6 motion. And that's the general standard that the district courts in this circuit have applied and that other circuits have applied as well. As my time is getting low, I'll point out just a couple other things here. So there were additional claims that were made in the complaint besides just the trade secret claim. There was a copyright claim. There was a tortious interference claim. And then there was an unfair and deceptive trade practice claim. Those claims were not developed, though. They were just sort of moving through in passing. I mean, the rattlement of the case is trade secrets. I realize these other things were thrown against the wall, but they weren't fleshed out. That's correct. And I point that out just to point out this court has several cases, including the Mayfield case, where it says that if issues aren't addressed on the opening brief, then they're deemed waived and abandoned. It's our position that those weren't addressed in Cisco's opening brief. In their reply brief, they point to a footnote that they included, which said, well, the dismissal of the unfair and deceptive trade practice claim and the tortious interference claim was based on the trade secret claim. So they don't even address the copyright claim at all in the footnote. But the district court's decision of dismissing the tortious interference claim and the unfair and deceptive claim was not just based on the trade secret. It did note when it dismissed the unfair and deceptive claim that to the extent it's relying on a trade secret that it was properly dismissed. But it also went on to find that it did not allege plausible facts to support an unfair and deceptive claim. So we would argue that those additional claims have been waived. Thank you. And I'll also just point out that this court, as far as the denial of the motion to amend the complaint after the entry of judgment, this court addressed a very similar circumstance in the Nicholson v. Medcom case. And in that case, it went through the different things that must be considered on such a motion. It said that courts will reasonably deny a higher number of post-judgment motions to amend. It said that it's an abuse of discretion standard, which is a standard of deference. It said that the district court is not required to give a dismissal without prejudice first before giving a dismissal with prejudice. And then finally, it's important here. It said that the district court could find that when there's no explanation given for the delay in amending the complaint and adding additional facts, that the district court could then presume bad faith. And so if you look at Judge Boyle's decision here and what he found, he specifically noted that Cisco had not provided any reason for the delay in seeking to amend the complaint or add more information. So under this court's decision in Nicholson, the court could presume that. I think we understand that. If there are no other questions, then. Well, let me just. We have no further questions. I would ask this court to affirm the district court. Okay. Ms. Pellegrino, you have some rebuttal time. Thank you, Your Honors. I want to start with Judge Richardson. You spoke about what DCS knew or had reason to know. And you initially noted that there was an allegation that SimTech was providing these trade secrets to DCS while at Cisco, and that was maybe a little bit confusing. And so just to clear that up, what the email analysis showed was that while those Cisco employees were still, you know, purporting to be Cisco employees, DCS and those employees were working together to establish and procure customers for SimTech. Did the email show that they sent trade secrets to DCS while they were employees at Cisco? We don't have that evidence. This is what I would say. The standard for use is knew or had reason to know that they were using or, you know, in some way, shape, or form, these unauthorized or improperly accessed trade secrets. I believe DCS's counsel acknowledged that if we had alleged knew or reason to know, a claim could exist. And we did. So what we alleged was that at JA44 through 45, we alleged the reason to know standard based on the fact that SimTech could not, along with DCS, have gotten this business off the ground without the use of those confidential and proprietary files and information, something that took Cisco years upon years to develop. They did in a matter of months and promised the customers precisely the same schedule as Cisco was promising them at the same time. At JA40 and 42, we also alleged actual knowledge. Your argument there is that because SimTech did it quickly, DCS must have known that SimTech had stolen trade secrets. That is the argument. Does that matter? Help me understand why that matters. So if that information then did not go to DCS, why would DCS be responsible for misappropriating trade secrets? Because it is serving as an agent for someone who did, right? So maybe SimTech maybe stole something. I still don't know what. But why would that impose liability on DCS for misappropriating trade secrets? Because it worked with someone who did? I think this goes to the definition of use under the Defend Trade Secrets Act and state statutes like it. And so what the argument has been is that DCS itself must actually possess or acquire these trade secrets in order to be liable under the Act. But I think that's not true under a plain reading of the Act. And the courts that have taken this up, the Third Circuit, the Fifth, the Eleventh, have all disagreed with that analysis. Because what the statute says, it defines different kinds of culpability, different kinds of misappropriation. So, for example, it defines acquisition, possession. It defines disclosure. It also defines use. And use, what the Third Circuit most recently in Oakwood said, was that use has to be construed broadly. It's most expansive definition. And so you would say it includes a scenario where hypothetically SimTech is known to have stolen trade secrets. And if they, without ever learning of the trade secrets themselves, DCS were to then broker a sale of SimTech's products, you think they have violated the Federal Trade Secrets Act? If, one more caveat, DCS knew or had reason to know that SimTech was improperly using those trade secrets. That's what the statute provides for. And what we've said is that there's an inferential knowledge here, the reason to know, because Cisco has had a longstanding 20-year history with DCS. DCS knows the work that's required in building and developing and manufacturing these things. A company like SimTech, which had never yet existed, could not possibly have done that in a matter of months. It still brings us back to the basic question, what exactly the trade secrets are. Which I understand. That's the whole thing. I understand. And I do hear the Court's concern. Again, hindsight is 20-20. But I would argue that inartful pleading isn't supposed to be the death knell of a claim. And I would argue that the appropriate remedy in this case is amendment. And I do just want to close the loop on the thought with Judge Richardson. Apart from the reason to know, I heard counsel say that we never actually provided actual knowledge. We did. We sent two letters to DCS informing them that SimTech was not authorized to use trade secrets and were using those trade secrets to develop and design these machines. Are those letters in the record? Yes, they are. Do they identify the trade secrets or do they sort of do what we do here, which is sort of says there's a bunch of stuff without specification? I don't remember the letters. Maybe I've seen them. Sure. They're referenced at JA 40 and 42. And candidly, yes, it does use the same kind of language. And again, I want to be cognizant of the Court's concern and of the District Court's concern. I hear the issues. And I think the remedy here, though, is amendment. And I want to address in the context of amendment one thing that. . . Counsel, thank you very much. Oh, sure. Thank you, Your Honor. We'll come down and recounsel and move into our final case.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Julius N. Richardson